May it please the Court, Counsel. My name is Peter Wetherall, and I represent the appellants and plaintiffs in this action, Mary Lou and Charles Primiano. Your Honors, if I may, with your permission, I'd like to cut to the chase and get directly to the summary judgment component of this claim. And in doing so, I just want to talk about and ---- I think the summary judgment stands or falls on the Daubert issue, doesn't it? If Weiss is in, then you probably have enough to resist summary judgment. If Weiss is out, you lose on summary judgment. Is that about right? Respectfully, Your Honor, I don't think that's the case, and I'd like to explain why that is. Okay. It requires digging into Nevada law a little bit. And specifically, before I get to that, let's just talk about the facts that are really the focal point of this summary judgment motion. Mrs. Primiano had a total elbow replacement in April of 2000. Two and a half months later, that total elbow replacement exhibited signs of failure. Namely, at that point, medical records reflected it was squeaking. Eight months later, we have a confirmation of product failure because her treating surgeon indicated that he diagnosed a ---- I think we know all this. Why no summary judgment? Okay. Even if you can't get Weiss in? Okay. Nevada law doesn't require an expert for ---- No, it doesn't require an expert, but federal court requires a genuine issue of material fact. Correct. How do you prove a product defect, a design defect? You don't have a failure to warn, I don't think, because the doctors are experts, so you must have manufacturing defects. Correct. Nevada law says evidence of an unexpected dangerous malfunction gives rise to an inference of a manufacturing defect. Your argument is that putting the left-hand hinge when a right one was called for or vice versa is prima facie evidence of that. No. I think that the left-right issue is actually a separate component of the basis of the argument. In Nevada, you don't need to attribute a specific cause of the defect in order to establish the defect. It just has to be unexpected. It just has to be unexpected. And the litany of cases that we've cited speak with unanimity for that and have for the ---- They see what has to be unexpected, too? In Nevada, the definition of product defect is that it has to act in a manner that doesn't comport with the reasonable expectations of the consumer, not Mrs. Primiano, but the reasonable consumer. And so ---- Be a doctor. No. That would be someone for whom ---- a patient. It wouldn't be the learned intermediary. It would be the patient. It would not be the learned intermediary. And so in this instance, you're confronted with the issue of whether or not this two-and-a-half-month indication ---- I have trouble understanding that because as a patient, you don't really know much about the devices the doctors are sticking in you. Well, in this case, fortunately, it doesn't really matter whether you want to say it's the doctor or the patient that has the reasonable expectation. Because in either instance, a product failure that initiates two-and-a-half months after implant and completely fails within eight months of implant is inconsistent with the physicians and the experts. And I'm not speaking of Dr. Weiss. I'm speaking of the defense experts in this case, their reasonable expectations. Let me get you to what's on my mind. We don't consult beforehand, and this may just be me. When I was in practice, there's no question Dr. Weiss would have come in. It was pre-Daubert. When I was a district judge, I think that was also all pre-Daubert, and Weiss would have come in. Now, here's my problem with Weiss. My instinct is let it in, because it's what I'm used to. But he doesn't cite articles saying usually these implants and artificial devices last in the neighborhood of years, not months. Although he's a medical professor, he doesn't cite things that he's written or that other people have written, at least directly. I think he mentioned something about what he called a series. And he doesn't really have much experience. He's just done five or ten of them. If he was a doctor who'd done 50 or 75 installations of artificial knees and artificial elbows and whatnot and said, look, I've done a bunch of these and they always last between five and eight years, that would be different, but he's only done five or ten of them. So how do we give him enough expertise to say it just didn't last as long as it would be expected to? His testimony was corroborated by other witnesses in the case, specifically Dr. Tate, the treating physician of Mrs. Primiano, testified that in his experience the lifespan of these implants is 10 to 15 years. The product manager, or I'm sorry, the product designer, I believe that's how Medica calls him, the product manager, testified at his deposition that these are intended to last six to ten years, and that he was aware of none, none, that had failed within one year. Dr. Guanchi, the expert for how Medica was asked this question, and he testified to his understanding there was a 25% failure rate after ten years. So only one quarter of these have failed after ten years. Under those circumstances, there is rather significant confirmation of what Dr. Weiss testified to, which is namely that this failure within eight months, to the point of there's metal-on-metal contact wearing into this woman's elbow, was clearly well beyond the scope of the reasonable expectations of physician or consumer. So you don't even need Weiss because you've got other evidence that shows ordinarily the lifespan would be years, not months. That's absolutely correct, Your Honor. We don't need him. We would like him, but particularly under Nevada law, we don't need him because He's saying less than these other fellows are. All he's saying is what he says with the name Yale next to it. Well, he's corroborative, and he's a witness that I retained. I mean, the other witnesses are hostile witnesses, but, yes, in fact, I got the same testimony from them, and it is corroborative of him. But it is important that you, and I think significant that you brought out that point, because we're not talking about a case where this product failed within 10 years in this woman's arm. That, I would suggest, would not lead us to where we are today, because that would be a no-brainer that a reasonable mind could not conclude that a product defect was the likely reason for that. Five years may be a closer call based on the testimony that I just identified for you. Here we're talking about two and a half months, the initiation of what appeared to be a failure, and within eight months. Two and a half months to the squeaking? Two and a half months to the squeaking, eight months to the entire failure of metal-on-metal grinding of the device that resulted in this metallic substance being leaked into her arm. Let me just ask, Dr. Weiss never saw the patient. He didn't test the material. He didn't consult with other physicians or scientists. Isn't that correct? That is correct. And that's also true of Dr. Guanji, the expert for the defense. And I understand what you're saying, that Dawbert requires a level of expertise and foundation. But there is a distinction in Dawbert and its progeny, which says that background training and experience counts for something as well. We're not talking about a scientific endeavor here. We're talking about this physician's background training and experience. And I need to double back, and in response to your Honor's comment about him only having done this five or ten times, I believe the record reflects that he's only done five to ten revisions. But Dr. Weiss is a hand specialist, an upper extremity specialist. He has not only implanted a multitude of these devices, he has designed one for another competing manufacturer. Did you say Weiss had implanted a multitude of these devices? Yes. He said he only did five or ten. It was five or ten revisions is my recollection of the record, Your Honor, meaning replacements of a prior failed one. Repair, yes. But he's done many more initial implants. I guess when your tire goes flat on your car, it's a repair, and when your artificial elbow doesn't work, it's a revision. Yes. That's the technical term. But I need to get back to this summary judgment thing, because you cannot look at the cases that we cited in Nevada spanning the last 20 years, those being Stachowicz starting in 1984, Jeep v. Murray, Allison v. Merck, Kraus v. Little, and Nevada Contract Services v. Squirrel, Inc., without seeing the uniformity in voice that indicates, number one, circumstantial evidence of product failure will suffice. You do not need direct evidence of it. I would have been a lot more comfortable with the case if, when I went through the excerpts of record, I had seen a bunch of medical articles about these things, but I didn't see them. Did I miss them? Are they there? They are not there. And one of the things that that's going to lead you to is a little bit of false security. Where are we going to find a medical article about this particular product? I read the New England Journal of Medicine. They have articles all the time comparing success with surgery and success without it, and talking about how well this drug works compared to placebo, and how well it works compared to another drug, and how well this type of surgical revision works compared to placebo. I can't believe there's not a literature. Let me tell you why there isn't, respectfully, Your Honor. We have a situation here that the product manager said was the first time it's ever occurred that the left ulnar component gets attached to a right humeral component in a person's right arm. Doesn't look like that even matters, according to your evidence, because it's the same piece. It's a symmetrical piece. It's like putting a ball bearing in the left side or the right side, and the only difference is which way you drill the hole, from the left or the right. Well, that's a pretty significant difference. The manner in which this is installed is dictated by whether or not you're putting in a left or a right component. But the component is identical. The component is the same size and shape, but the manner in which you install it and the manner in which it is attached to the other component is reversed if you use the reverse component. Did you have any evidence showing? I thought there was no evidence showing that it mattered which direction they had drilled from to the kind of failure that occurred. The evidence is that no one can say whether or not that makes a difference. All we know is that Dr. Tate had to approach this operation in a different way than the surgical protocol required with a right-right component. In terms of not having evidence, I can't prove a negative. If it's never happened before, I'm not going to see a study that says the success or failure rate of a left-right component together. I'm not going to see articles discussing the reasonable expected lifespan of a left-right component. And that's why I say there has to be some flexibility in this Daubert analysis. Dr. Weiss, I believe to his credit, said, I don't know whether it had an effect or not, because I don't have studies, I don't have experience in anyone putting in a left and right component together. So I can't say it had an impact, and I can't say that it did have an impact.  And I would add to the Alan Torrey case, which said we need not always adhere to the specific factors mentioned in Daubert, but rather must be tied to the facts of the particular case, and these are unique facts. They are unique facts, and that's why we're not going to see research and study into this issue. But, again, we do have the benefit of corroborating testimony from these other physicians that set us up. We talked about admitting medical testimony in Sandoval-Mendoza, and he said that the way to apply Daubert there is a trial court should admit medical expert testimony if physicians would accept it as useful and reliable. Utility to the jury of medical expert testimony should be determined by what physicians would accept as useful. We recognize there that doctors don't work the same way as sociologists do with statistical studies, different art. Could you, you did not argue in terms of that Sandoval-Mendoza test, could you articulate why on this record you've shown that physicians would accept what Weiss said as useful and reliable? Well, number one, his opinion with regard to the expected lifespan of this product is premised upon a tremendous amount of background training and experience in just these types of operations and just these types of prosthetics. The rule has to be given some flexibility, because these physicians, practicing physicians don't necessarily research and write articles all day. They have a clinical perspective. And so... Most physicians in the course of elbow artificial replacement, if they have a question about the propriety of a device to be installed, don't call the manufacturer, do they? Oh, I think they do. I think that, based on my understanding, for medical products like this, they absolutely do consult the product tech that stands right beside them in the surgical field. And if they have a question, they contact the product manager. My understanding in this case is that they called and said, hey, I've got a, what is it, a left instead of a right? And he said, go ahead and use it. Well, that was the report back to the physician from the technical rep. And, I mean, that's yet another component of this case that is significant, but not significant to the summary judgment, I don't think. But the fact is that this product rep first notified this physician while this woman was open on surgery, in the surgical field, and only then indicated, hey, doc, I've got mismatched components here, but I checked with my product manager, and it seems like it's okay because it's symmetrical. Contrast that to what the product manager says, which is, it's symmetrical, but I would never recommend installing the two this way, because it goes against surgical protocol. And that left us with the circumstance that we now have. Where's the part about from Weiss where he says how experienced he is? I'd like to reserve my time, and I'll look for that, if that's okay. I want a page number. Thank you, counsel. Good morning, Your Honors. My name is Frederick Baker for Appellee Helmetica, and with me is Brian Thompson from my office. In light of that discussion, let me begin by saying that there is no evidence whatever in this record that the use of the left humeral with the right ulna had any bearing on the outcome in this case. Dr. Weiss did not testify to that. What he said was, I can't tell one way or another, I just don't know. As I look at them, they look identical. Counsel, let me tell you what's on my mind. I read the record the same as you about that, that it's an identical piece. It's like a ball bearing. It's symmetrical. What bothered me was something different. First step, nobody in his right mind would have an artificial elbow installed into their elbow if they're going to get four or five subsequent operations because of failure within months. Nobody in his right mind would submit to that. And all the doctors pretty much say that with varying degrees of foundation for what they say. They don't put it in quite those terms. And then I look at Sandoval-Mendoza. Actually, I kind of remember Sandoval-Mendoza, where the judge kept out the medical evidence and we reversed them, and we said, doctors don't do double-blind studies on humans often because of their ability to see. Ethical concerns, and because of the complexity and the uncertainty of etiology. So although there are sometimes double-blind studies with medicine, sometimes there aren't. Experience, the personal knowledge and experience of the doctor can be adequate foundation without scientific studies. We pretty much opened the door to much greater liberality for admitting a medical condition. Medical testimony, because it often has a clinical rather than an experimental basis. And it looks like the judge and the lawyers really weren't following Sandoval-Mendoza here. Well, I think they were, Your Honor. I mean, let's begin with the point that the Supreme Court has said, and this Court has said in Daubert II on remand, Judge Kaczynski said that one of the first things we look at is whether or not the opinion that's being expressed was generated exclusively for litigation as opposed to being disseminated to the medical and scientific community. That cuts against Wife. If it is, if it is that sort of an opinion, then there's a heightened scrutiny. We at the very least demand a rigorous scientific evaluation. Okay. Now, you're right so far, but you haven't related it to Sandoval-Mendoza or to Weiss's experience and knowledge base. Here's the difference. I mean, you're correct. He had five or ten revisions, and that's the relevant thing here. How many artificial elbows and other joints has he installed? I don't know, but the issue here is failure. Did he? I had thought he just had done five or ten operations like this, and counsel for plaintiff corrected me and said, no, he's done five or ten revisions. Fancy word for fixing a flat tire. Five or ten repairs, but that's the whole issue here, Your Honor. What else do we know about Weiss's experience? Well, he's an orthopedic surgeon. He's done a lot of work. He's an orthopedic surgeon who's a professor at Yale. How many joint replacements has he done? Did anyone ask him? I don't know, Your Honor. You don't remember the record on that? I know that his opinion in this case was based on the five to ten revisions that he had done. Well, if a doctor said I've done 15 of them and I did five or ten revisions of the 15 that I did, that would mean one thing. And if he said I've done a thousand of them and I've done five or ten revisions, that would mean another thing. So I'm trying to find out. Well, what I do know, I don't know the answer to that question, Your Honor, but I do know that in his opinion, as he stated it in his report, he did not base his opinion on the number of operations he had performed. He said I've done five or ten of these revisions. I think that's in his report, but anyway, that's what he testified to in deposition. I gave you a chance to address Sandoval-Mendoza, and I noticed you avoided mentioning it and went straight to Dawbert in the Supreme Court and Dawbert on remand. Do you wish to say anything about Sandoval-Mendoza? Yes, I think it's distinguishable because in this case the issue is whether or not this revision occurred outside what some would expect. And he based his opinion solely on his subjective belief that he would expect it to last. He thinks other... What about the other doctors who said that in their experience these things last a matter of years, not months? Well, Your Honor, excuse me, could I go back to Dr. Weiss before we move on to other doctors? In his deposition he said he did not think this would affect the outcome of the surgery, but in his declaration he did not rule out this configuration as a contributing cause of appellant's elbow failure. Isn't that right? Yes, and when he was examined in deposition he said I can't rule it out or I can't rule it in, and I can't rule it in. I just don't know is essentially what he said. All right. I just want to make clear that he didn't say the opposite. All right. Well, it's plain as burden of proof here, and... We know the generalizations. Okay, Your Honor. We don't deny, Your Honor, that this thing failed earlier than expected. I think the normal expectation is that they do last longer. Isn't that the Nevada test? I'm sorry? Isn't failed earlier than expected, your words, isn't that the Nevada test? No, Your Honor, no. There are other alternative causes suggested in the record, and let me talk about the Nevada test, if I may, then. I mean, we're sort of segueing off here, but counsel's analysis skipped the critical, the most important part of that analysis. What these Nevada Supreme Court cases say are uniformly and emphatically, if the plaintiff meets their threshold burden of proving that a dangerous malfunction in a product was the cause in fact of their injury, then they're entitled to an inference, or they're relieved of the burden of demonstrating the specific nature of the defect. But in every case, every one of these cases, and I'll discuss each one of them, the Court emphasizes, and in each case found, in fact, that the plaintiff had met that threshold burden of proving causation. And the point here is there is no evidence in this record, no competent medical or scientific evidence that anything about the design or manufacture of this implant was the cause in fact of this plaintiff's injury. Dr. Weiss specifically said --" Wait a minute. She didn't have a separate injury. The reason she needed all those operations was the failure of the device. The failure is the injury. There is nothing in this record, nothing, which suggests no competent expert testimony which suggests or states that anything about the design or the manufacture of this implant was the cause of this failure. Dr. Weiss was asked, can you opine that it was the use of the left with the right? And he said, no, I just don't know. To me, they look identical. I can't see anything about the design of this device that was used. They look identical? Are the left elbow pieces and the right elbow pieces the same pieces? You just put them in a different box and one says L and one says R? Right. Because of the way the pins go in. Other than that, they're identical. Because of the way the pins go in the pieces or the way the pins go in the bones? On the right, it goes from right to left, and on the left, it goes from left to right. And that's just so that they can keep them separate. I don't know if I made my question clear. Pins can go from left to right or right to left. And it can just be a difference in where you drill the holes in the bones, or it can be that there's a difference in the pieces. I'm trying to find out which it is. It's just the direction in which they drill the hole, Your Honor. So you're telling us that these devices are interchangeable? Yes, except for the way that they're placed. Absolutely no reason to label them left and right? That's what the engineer said, Your Honor. I've never done any elbow replacements, of course, but I've used plenty of pins. Some of them have screws, and they have things near the head so that you have to stick them through the piece from one direction and not the other. Some of them are just smooth, and you just stick one of those springy pins through the hole at the end of the pin, and that holds it in. And it doesn't matter. There's no difference between sticking it in the right and the left, except for whatever it's inside. And I'm trying to see which kind this is. All I know, Your Honor, is what's in the evidence. And the evidence looks at these things. I have not personally looked at them. And you argued earlier that Dr. Weiss stated he was basing his opinion solely on his experience in doing revisions. Don't hold me to that, Your Honor. I'd have to go back and look. Well, that's what you said. I'm sorry. That's my recollection. But I'd have to go back and look to make sure. Can you tell me who are in the record he says that? I'll define it for you, Your Honor. No, I didn't say solely, Your Honor. I mean, he did testify based on general experience as a United States version. I mean, he did say those sorts of things. But in response to Judge Kleinfeld's questions about whether his experience in performing initial surgeries would be relevant to his opinion, you said, but he thinks Dr. Weiss made clear that he was basing his opinion solely on revisions. I don't think that's what I said. If I did, I misstated, Your Honor. I'm sorry. But that was. So if Dr. Weiss had done five revisions and a hundred initial installations, would that bear upon his ability to render an opinion in a case like this? Would a hundred bear on that? I don't think it would, Your Honor. I mean, the issue. It would have no bearing whatsoever, the fact that he installed a hundred of these in elbows in a hundred different patients and had never experienced this short duration of malfunction, whatever. Well, Your Honor, still. I mean, it would have no relevance in your mind? It would certainly show that he was a more experienced elbow installer. But still, it doesn't get to the question of his inability to establish a triable issue of fact material to whether or not the design of this implant caused this person's injury. And he specifically said that he could not. You know, if he did 10,000 of them, the fact that this one failed sooner than he expected really is irrelevant if he cannot establish causation. I don't understand why. Back in the 70s, when it got cold, when it got colder and about 30 below, I used to have to replace a tire about once every week or two because they'd lose their bead. Starting in the 80s, my tires didn't lose their beads anymore. I live in a cold climate. And I hardly ever had to change a flat except when I drove over rough road. It seems like it's a fair inference that they must have changed the way they made the tires, which, in fact, is true. They changed the rubber. Well, that may be true. Why can't you draw an inference from that kind of experience? Because you still have to prove causation, Your Honor. I mean, that is the law of Nevada and that is the law of every jurisdiction that I know of. I mean, the cases that the plaintiffs have relied on stand for a very straightforward proposition, as I have explained. If you meet your burden of proving medical causation, that a dangerous malfunction in the product caused your injury, then you're entitled to this inference, what they call a race-episode-type inference. But you first have to establish causation. How do you establish causation in a case like this? You have to have competent, reliable, expert medical testimony, not just that you've seen a bunch of them, but there's something about the design or the manufacture of this implant that caused it to fail. Well, sometimes something, you see it fail pretty consistently, you don't know why. It's a fair inference there's something wrong with the way it's made. And then the maker can check on it. Like years ago with the Audi accidental acceleration cases, it kind of looked like there was something wrong with the brake and every now and then you'd hit it and the car would accelerate. Well, as it turned out, there wasn't. The brake work, it's just the brake and the gas pedal were close together and sloppy drivers would hit the gas when they meant to hit the brake. Let me see if I understand your bottom line, which appears to be there was nothing wrong with the device. Now, the inference from that is that there was something wrong with the way in which it was inserted in the elbow, that it was the doctor's fault, not the device. Is that what you're inferring? Here's my bottom line, Your Honor. We had Dr. Tate, who did the initial revision, testified that when he did the revision he thought there was evidence of excess wear and he thought that's what caused it to fail early. Dr. Meals, who did a later revision, testified that, you know, these things happen. When we have a young active person with serious degenerative bone disease, we do the best we can, but these things happen. This does not seem out of the ordinary to me. Dr. Broadman testified, a highly qualified expert. He looked at the x-rays, he looked at the medical records, and he saw evidence that when this thing was initially installed, it was misaligned, and that caused this early failure. So we've got three factors. Wasn't there testimony from the doctor that took it out? He said the piece of plastic in between the two pieces of metal showed excess and asymmetrical wear? Yes. And the plaintiffs, first of all, Dr. Weiss said... In front of a jury, counsel. Okay. First of all, Dr. Weiss testified that he not only did not have an opinion about whether or not that plastic was defective, he wasn't capable. He didn't have the expertise to make that finding. That was their sole expert. Counsel sent it to be destructively tested to find out if there was a defect in that polyurethane, and the results came back no. So there is no evidence whatsoever that there was a manufacturing defect for that disc. No evidence whatsoever seems strong. It's like then you could get a plastics expert in who said, in fact, this plastic should last a whole lot longer, and then the response would be, can you explain the molecular structure of the plastic? That's the plaintiff's burden. And how ozone affects it? That's not our burden. That's the plaintiff's burden. If they're going to claim that there's a manufacturing defect... It's not the point. You've got to explain away what looks like something they've proved. Well, they haven't proved it. First they've got to prove it, and then we can disprove it. But they haven't even gotten to the first stage of proving it. But if we had allowed Dr. Weiss to testify, would we have had a genuine issue of material fact which would have precluded summary judgment? No, Your Honor. Why not? Because that testimony, giving it every benefit of the doubt, does not establish causation. He says, I don't know if there was a manufacturing defect. I've got no reason to believe there is. I don't know if the design caused this. I have no reason to believe that it did. I have no basis. This is what he said. I have no basis on which to conclude that the design or the manufacture of this implant caused this failure. And when we have the plaintiff's own experts saying there is no scientific basis for reaching that conclusion, and we've got the testimony of other people saying there are potential other causes for this early failure, then what other ‑‑ then there is no tribal issue of fact. There is no material issue, tribal issue of fact, material to whether or not the design or the manufacture of this implant caused this failure. There simply is not. I thought the Nevada law was that all you have to establish is that the product failed to perform in the manner reasonably expected in light of its nature and intended function. It's from Allison against Merck. Allison. That's an interesting case. Let me talk about that for just a second. In Allison, the seventh part, by telling me ‑‑ does that describe the test? No. No, because what the court says repeatedly and emphatically in Allison is if, if plaintiff proves causation, which was not an issue then, if plaintiff proves causation, then plaintiff is entitled to that inference. In Allison, causation was not before the court. That was, in that case, a 17‑month‑old child developed encephalitis after receiving a mumps, measles vaccine. And the defendant moved for summary judgment on the ground that it was immune from liability, even if it caused it, under restatement and several other doctrines, because it was unavoidably unsafe. The risk was conceded to exist, but was thought to be extremely rare. So what the court said was, if plaintiff proves that the vaccine caused this injury, then they are entitled to this inference of a defect. But causation had not been tried. Causation was not at issue. And it is inconceivable in that case that the issue of causation would have been tried without expert medical and scientific testimony. I have never seen a pharmaceutical case where experts did not testify on either side. And the law in Nevada does not relieve the plaintiffs of the burden of proving causation through reliable medical and scientific testimony. And they did not have that here, Your Honor. They simply did not. Thank you. Even if you accept Dr. Weiss' testimony at face value, it does not raise a triable issue of material fact on the question of causation. Thank you, counsel. Thank you, Your Honor. And you're going to tell us, if you find it, where in the record Dr. Weiss said his opinion was based solely upon? I said solely. I mistook. I did not mean to say solely. Counsel? If I could begin by answering your question about Dr. Weiss' experience. At Volume 1 of Plaintiff's Excerpts of Record, Exhibit 11, Dr. Weiss' testimony begins at what is identified as page 100, but it's actually page 46 of his deposition. He's asked, How many prostheses have you personally placed during your clinical practice here in Providence, if you could provide any kind of estimate for me? Answer, I would say 20 to 30, something like that. And he goes on to say, Most of my elbow work is limited to total elbow replacement at this point. I do some nerve surgery as well. And then he goes on to say about three to four elbow surgeries a year. The reference to five to ten is found at page 52 of his deposition, where he has asked, In your practice, have you ever implanted a total elbow in a patient who has experienced a distal humerus fracture? Yes. How many occasions? I would also say five to ten times. So that was the testimony in terms of his experience. That doesn't sound like a lot, Your Honors, but I would submit to you that elbow surgeries are extremely rare. Was there any literature? Did he cite any articles? For what? The proposition that this prosthesis, prosthetic elbows? I don't believe so. I don't have a reference for you. Let me ask you about something else that's on my mind. You might have noticed I kept asking your adversary about Sandoval Mendoza, and he kept dancing away. And I was curious about it, so I looked in your tables of authorities. You didn't cite Sandoval Mendoza. Your opponent didn't cite Sandoval Mendoza. You didn't cite it in your reply brief. And that's where we spent about two pages laying out how you get physicians' testimony and when it can be kept out under Daubert. That makes me think, with smart lawyers like you and your adversary, that there's a reason, and that I'm wrong in thinking it has some relevance. What's the matter with Sandoval Mendoza? Your Honor, based on what you've described about it, it is relevant. However, the emphasis and the point I am trying to accomplish Is this something where you read it and decided not to cite it because you think that it should not be used in this case? No. I don't recall having come across the case, Your Honor. But the crux of my position here, if I accomplish This is just a situation where it's out there, but neither side happened to discover it. Correct. So that's not to suggest that we'd be erroneous in considering it. Not at all. And based on your brief description of its holding, I think it does have some relevance to this case. But what also has relevance to this case is Nevada law. And I've heard it misrepresented here today again. And I need to set the record straight, not in my own words in terms of summation, but in terms of Nevada courts, the Nevada Supreme Court and what it has held. Because you've heard a reference today, again, that when there's alternate causes, then the plaintiff has a burden. And that the plaintiff has to prove by direct evidence what the cause of this defect is. That is not the law as stated by the Nevada Supreme Court in multiple decisions, of which I've cited you to. Specifically, in Stachowicz, the court says, Nissan contends that the plaintiff was required to produce direct evidence of a specific product defect and was further required to negate any alternative causes of the accident. We do not agree that such a restriction may be placed as a matter of law upon the form of proof that is required to establish a defective product. When there is evidence of some dangerous condition, the fact finder can find where other identifiable causes are absent, that the mere evidence of a malfunction is sufficient evidence of a defect. Setting aside Dr. Weiss, other physicians in this case have ruled out the most plausible causes of the failure of this elbow. Dr. Tate, the treating surgeon, said her age was not a factor because she had rheumatoid arthritis. She was like an elderly person in terms of her activity. The time has expired, so we're going to wrap up. Thank you. I'll submit it on that. Thank you. Thank you, counsel. The supplemental excerpts of records at page 61, he does not say the only thing. He says he doesn't say this was the only basis for his opinion. He says, can you give me an estimate of the total type of those type of revision surgeries, such as the one in this case? Which case are you talking about? Page 61 of the supplemental excerpts. You performed since 1991, less than 10, probably 5 to 10, somewhere in that ballpark. And in his declaration, he doesn't give his extensive experience in implanting new ones as a basis for opinion. Thank you. We don't want argument, just the site. Okay. Thank you, Your Honor. Thank you, counsel. Thank you. Cremiano versus Hamedica is submitted. I'm so glad. I didn't know what you were talking about with Sandoval. I hadn't found Sandoval, either. I was inside in the breeze. I know. So I didn't know what you were talking about. I'm really interested in this. Yeah. Yes. It's a bummer for me. I did this kind of thing. Showcase Mall versus Milstein.
judges: Nelson, Kleinfeld, Hawkins